**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MONICA LYNN DAVIS-WILKES,

        Plaintiff,

v.                                    Case No.   3:18-cv-663-J-34JRK[1]

KENNETH BRYAN HELMS,

        Defendant.

_____

## **REPORT AND RECOMMENDATION**[2]

This cause is before the Court on Plaintiff, Monica Lynn Davis-Wilkes's Motion for Final Default Judgment Against Defendant Kenneth Bryan Helms (Doc. No. 86; "Motion"), filed June 7, 2019. Plaintiff initiated this action on May 22, 2018 by filing a Complaint (Doc. No. 1). Defendant was served with process on June 18, 2018. See Return of Service (Doc. No. 9), filed July 13, 2018. With leave of Court, Plaintiff filed a First Amended Complaint (Doc. No. 17; "Amended Complaint") on August 22, 2018. See Motion to Amend Complaint to Substitute Party (Doc. No. 15), filed August 13, 2018; Order (Doc. No. 16), entered August 21, 2018. Plaintiff mailed the Amended Complaint to Defendant. See Amended

---

[1]   This matter was consolidated with In re: The Complaint of Crystal Cove Resort, LLC, Case No. 3:18-cv-1166-J-34JRK on January 9, 2019. See Order (Doc. No. 57). That case, however, was closed on June 12, 2018 because, as discussed below, the parties reached a settlement. See Order (Doc. No. 87).

[2]   "Within 14 days after being served with a copy of [a report and recommendation on a dispositive issue], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." Id. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

Complaint at 19 (certificate of service). On November 8, 2018, Plaintiff moved for entry of default because Defendant failed to timely respond to the Complaint or otherwise appear in this case. See Motion for Entry of Default by Clerk (Doc. No. 43). The Clerk of the Court entered default against Defendant on November 16, 2018. See Entry of Default (Doc. No. 45). Thereafter, the instant Motion was filed.

On August 12, 2019, the Court entered an Order (Doc. No. 88) taking the Motion under advisement, directing Plaintiff to send a copy of the Motion and the Order to Defendant, directing Defendant to respond to the Motion no later than August 21, 2019, and setting an evidentiary hearing on damages for August 27, 2019. Defendant failed to respond to the Motion. The evidentiary hearing was held accordingly. See Clerk's Minutes (Doc. No. 92). Plaintiff and her counsel were present at the hearing, but Defendant did not appear. See id.

Upon review of the Motion, the hearing testimony, and the file as a whole, the undersigned finds that the Motion is due to be granted for the reasons stated below.

## II. Background

Plaintiff's claims against Defendant arise out of injuries Plaintiff sustained as a result of a collision in the St. John's River between Defendant's vessel ("Vessel") and a pontoon boat Plaintiff was aboard ("Pontoon Boat"). In addition to bringing claims against Defendant, the Amended Complaint asserted claims against CDR Maguire, Inc. ("CDR"), Crystal Cove Resort, LLC ("Crystal Cove"), and Dakota Sams ("Mr. Sams"). See generally Amended Complaint. At the time of the collision, CDR was Plaintiff's employer; Crystal Cove was the owner of the Pontoon Boat; Mr. Sams was the driver of the Pontoon Boat; and Defendant was the driver and owner of the Vessel.

On June 12, 2019, the Court dismissed with prejudice the claims raised between Plaintiff and CDR, Crystal Cove, and Mr. Sams in light of the parties' settlement.[3] See Notice of Settlement: Specified Parties and Claims (Doc. No. 84), filed April 30, 2019; Stipulation for Dismissal of Action (Specified Parties) and Release of Funds (Doc. No. 85), filed June 7, 2019; Order (Doc. No. 87), entered June 12, 2019.

According to the Amended Complaint, Plaintiff was working on board the Pontoon Boat on January 15, 2018 when Defendant's Vessel overtook the Pontoon Boat. Amended Complaint at 3 ¶ 9. The Vessel "struck [the Pontoon Boat] from astern, knocking [Plaintiff] into the water." Id. The Vessel "failed to maintain a proper lookout" and "failed to maintain a reasonable speed under the prevailing conditions." Id. ¶ 10. Because the Vessel was the "'overtaking vessel[,]' it had the primary duty to keep clear." Id. The Vessel "failed to take reasonable actions to avoid the collision." Id. Plaintiff asserts two counts against Defendant: 1) negligence under general maritime law, see id. at 10-12; and 2) negligence per se, see id. at 12-13.

### III. Legal Standard

Rule 55, Federal Rules of Civil Procedure ("Rule(s)"), provides the requirements for entry of a default judgment. See Fed. R. Civ. P. 55(b)(2). A default judgment may be entered "against a defendant who never appears or answers a complaint, for in such circumstances the case never has been placed at issue." Solaroll Shade & Shutter Corp. v. Bio-Energy Sys., 803 F.2d 1130, 1134 (11th Cir. 1986). All well-pleaded allegations of fact are deemed admitted upon entry of default; however, before entering a default

---

[3] The case referenced supra note 1 (In re: The Complaint of Crystal Cove Resort, LLC, Case No. 3:18-cv-1166-J-34JRK) was closed in light of this settlement.

judgment, a court must confirm that it has jurisdiction over the claims, and that the complaint adequately states a claim for which relief may be granted. See Nishimatsu Const. Co. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975);[4] see also GMAC Commercial Mortg. Corp. v. Maitland Hotel Assocs., 218 F. Supp. 2d 1355, 1359 (M.D. Fla. 2002) (stating that "[a] default judgment cannot stand on a complaint that fails to state a claim") (citations omitted).

## IV. Discussion

In determining whether the Motion should be granted, the undersigned considers whether there is jurisdiction over the claims, whether Plaintiff has stated valid claims for relief, and whether Plaintiff has set forth sufficient evidence to establish entitlement to the damage award sought. These issues are addressed in turn below.

**A. Jurisdiction**

This case is properly within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 because the collision occurred on a navigable waterway in Florida. See Amended Complaint at 1 ¶ 1, 10 ¶ 12; Foremost Ins. Co. v. Richardson, 457 U.S. 668, 677 (1982). The undersigned is also satisfied that the Court has personal jurisdiction over Defendant because Defendant is a resident of Florida. See Amended Complaint at 2 ¶ 5. Plaintiff is neither a minor nor an incompetent person. See Declaration Pursuant to 28 U.S.C. § 1746 (Doc. No. 97-1), filed January 15, 2020. Additionally, Plaintiff has complied with the Servicemembers Civil Relief Act to the extent required. See Affidavit in

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981.

Compliance with the Servicemembers Civil Relief Act (Doc. No. 97-2), filed January 15, 2020.

**B. Claims for Relief**

As a preliminary matter, the undersigned finds that federal maritime law governs the substantive issues in the case because this is an action in admiralty. See Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1358 (11th Cir. 1990). Plaintiff seeks a default judgment presumably on both counts against Defendant: general maritime law negligence and negligence per se. See Motion at 2-3;[5] Amended Complaint at 10-13. These claims are addressed in turn below.

**1. Count I – General Maritime Law Negligence**

The Amended Complaint alleges as follows. Defendant "had a duty to exercise due care for the safety of . . . [P]laintiff in the care, maintenance, operation, navigation and provision of equipment for the [V]essel which he owned and/or operated." Amended Complaint at 10 ¶ 44. Defendant also had a duty to keep clear, as he was driving the "overtaking vessel." Id. at 11 ¶ 46. Defendant "failed to maintain a proper lookout," "failed to maintain a reasonable speed under the prevailing conditions," and "failed to take reasonable actions to avoid the collision." Id. at 3 ¶ 10, 10-11 ¶ 46; see also id. at 10 ¶ 49. "As a proximate result of the acts and omissions of . . . [D]efendant, [P]laintiff has been injured in and about her body and extremities, suffered pain therefrom, incurred medical expenses in the treatment of her injuries, suffered physical handicap, scarring and disfigurement and the loss of her ability to work." Id. at 11 ¶ 50. The collision and Plaintiff's

---

[5]     The Motion contains unnumbered pages. Citations to it follow the pagination assigned by the Court's electronic filing system (CM/ECF).

injuries "were caused solely by, and due wholly to, the unseaworthiness of [D]efendant['s V]essel, and by the fault and negligence of the [V]essel and of the persons in charge of [it]." Id. ¶ 47.[6]

"In analyzing a maritime tort case, [courts] rely on general principles of negligence law." Chaparro v. Carnival Corp., 693 F.3d 1333, 1336 (11th Cir. 2012) (citation omitted). The elements of negligence are as follows: "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." Id. (citation omitted).

Here, Plaintiff has alleged sufficient facts, taken as true, to establish the elements of general maritime law negligence with respect to Defendant. Defendant breached his duty to exercise "ordinary reasonable care under the circumstances." Id. (emphasis and citation omitted). Specifically, Defendant (as the driver of the overtaking vessel) failed to keep out of the way of the Pontoon Boat and "take early and substantial action to keep well clear." Inland Rule 13, United States Uniform Inland Navigational Rules ("Inland Rule(s)"),[7] 33 C.F.R. § 83.13; Inland Rule 16, 33 C.F.R. § 83.16; see Amended Complaint at 3 ¶¶ 9-10, 10 ¶¶ 45-46. Defendant also failed to "maintain a proper look-out," Inland

---

[6]     The Amended Complaint at times refers to the Vessel as "[t]he defendant vessel." E.g., Amended Complaint at 11 ¶ 47, 12 ¶¶ 52, 54. The Vessel, however, is not a party to this action.

[7]     The Inland Rules "apply to all vessels upon the inland waters of the United States." 33 C.F.R. § 83.01(a). Inland waters are defined as "the navigable waters of the United States shoreward of the navigational demarcation lines dividing the high seas from harbors, rivers, and other inland waters of the United States and the waters of the Great Lakes on the United States side of the International Boundary." 33 C.F.R. § 83.03(q). The St. John's River is part of the inland waters of the United States. See 33 C.F.R. § 80.01 (providing, "The regulations in this part establish the lines of demarcation delineating those waters upon which mariners shall comply with the . . . Inland . . . Rules"); 33 C.F.R. § 80.723 (establishing demarcation lines from Amelia Island, FL to Cape Canaveral, FL). Therefore, the Inland Rules are applicable here.

Rule 5, 33 C.F.R. § 83.05; to "proceed at a safe speed," Inland Rule 6, 33 C.F.R. § 83.06; to "use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists," Inland Rule 7, 33 C.F.R. § 83.07; and to take "[a]ny action . . . to avoid collision . . . in accordance with [Inland Rules 4-19]," Inland Rule 8, 33 C.F.R. § 83.08. <u>See</u> Amended Complaint at 3 ¶ 10, 10-11 ¶ 46, 11 ¶ 49. These breaches were the actual and proximate causes of the collision and of Plaintiff's resulting damages. <u>Id.</u> at 11 ¶¶ 47, 50. Plaintiff's damages include pain; past, present, and future medical expenses; physical handicap; scarring and disfigurement; the loss of her ability to work; and a diminished and/or destroyed capacity to enjoy life. <u>Id.</u> ¶ 50.

### 2. Count II – Negligence <u>Per</u> <u>Se</u>

Plaintiff alleges that Defendant's Vessel violated Inland Rules 5, 6, 7, 8, 13, and 16 (as set out above). <u>See</u> Amended Complaint at 12 ¶ 52. Specifically, Plaintiff asserts that Defendant's Vessel "failed to slow, stop or reverse [its] engines when [it] saw or should have seen that there was danger of collision and failed to take any responsible precautions to avoid the collision." <u>Id.</u> ¶ 54. As noted, Plaintiff also alleges that Defendant "failed to maintain a proper lookout," "failed to maintain a reasonable speed under the prevailing conditions," and "failed to take reasonable actions to avoid the collision." <u>Id.</u> at 3 ¶ 10. Plaintiff asserts she "is a member of the class of persons intended to be protected by these [regulations]." <u>Id.</u> at 12 ¶ 53.

The elements of negligence <u>per</u> <u>se</u> are as follows: "(1) violation of a regulation; (2) causing the type of harm that the regulation was intended to prevent; and (3) injury to a member of the class of persons intended to be protected by the regulation." <u>Lemma Ins. (Europe) Co. v. Rumrunner Sport Fishing Charters, Inc.</u>, No. 8:11-cv-2110-T-33TBM, 2012

WL 254134, at *2 (M.D. Fla. Jan. 27, 2012) (citing Marshall v. Isthmian Lines, Inc., 334 F.2d 131, 134 (5th Cir. 1964)) (unpublished) (admiralty collision case).

Plaintiff has alleged sufficient facts, taken as true, to establish the elements of negligence per se with respect to Defendant. First, Plaintiff has sufficiently alleged that Defendant violated a number of regulations: Inland Rules 5, 6, 7, 8, 13 and 16. See Amended Complaint at 3 ¶ 10, 12 ¶ 52. Second, Defendant's violations of the Inland Rules caused a collision—the precise type of harm that the Inland Rules were intended to prevent. Third, Defendant's violations caused injury to Plaintiff, who was a member of the class of persons intended to be protected by the Inland Rules as a passenger in a "vessel[ ] upon the inland waters of the United States." See Inland Rule 1, 33 C.F.R. § 83.01(a). Specifically as to Inland Rules 13 and 16, Plaintiff was a passenger in an overtaken vessel, and thus a member of the class of persons intended to be protected by those particular Inland Rules.

**C. Damages**

The Court has the obligation to assure that there is a legitimate basis for any damage award it enters. Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003). "[D]amages may be awarded only if the record adequately reflects the basis for the award via a hearing or demonstration by detailed affidavits establishing the necessary facts." Adolph Coors Co. v. Movement Against Racism & the Klan, 777 F.2d 1538, 1544 (11th Cir. 1985) (internal quotation marks and citation omitted).

In support of her claim for damages, Plaintiff attached the following exhibits to the Motion: 1) The Declaration of Plaintiff, Monica Lynn Davis-Wilkes, in Support of Motion for Final Default Judgment (Doc. No. 86-1; "Pl.'s Declaration" or "Plaintiff's Declaration"); 2)

Deposition Transcript of Carlos R. Tandron, M.D. (Doc. No. 86-2; "Dr. Tandron's Dep." or "Dr. Tandron's Deposition");[8] and 3) Memorandum of Rose Zayco, Psy.D. (Doc. No. 86-3; "Dr. Zayco's Mem." or "Dr. Zayco's Memorandum").[9]  In addition, at the August 27, 2019 evidentiary hearing, Plaintiff testified about her injuries resulting from the accident, her medical expenses, and her subsequent loss of earnings. Plaintiff submitted ten exhibits into evidence. See Plaintiff's Exhibit List (Doc. No. 92-1); Plaintiff's Exhibits (Doc. Nos. 92-2 through 92-11).[10] George Namho (Plaintiff's friend, who was in Illinois at the time of the evidentiary hearing) was scheduled to testify via telephone, but he was unable to because of issues with the notary who was with him. See Order (Doc. No. 90), entered August 26, 2019; Tr. at 5-9. The Court directed Plaintiff to file a declaration from Mr. Namho instead. Id. at 8-9. On September 5, 2019, Plaintiff filed the Affidavit of George Namho (Doc. No. 93-1; "Namho Affidavit" or "Mr. Namho's Affidavit").

Initially, the undersigned summarizes Plaintiff's testimony and Declaration. Then, Dr. Tandron's Deposition, Dr. Zayco's Memorandum, and Mr. Namho's Affidavit are discussed in turn.

---

[8]     Dr. Tandron treated Plaintiff after the accident. See Dr. Tandron's Dep. at 6-7. Specifically, he treated her for issues with her shoulder, including loss of strength; "popping, grinding, and pain with range of motion"; and stiffness. See id. at 7. Dr. Tandron graduated from Emory Medical School and completed his residency at Emory in 1989. Id. at 4. He is board-certified and subspecializes in sports medicine. Id. at 4-5. He has been in private practice in Jacksonville for thirty years "doing primarily knee and shoulder surgery." Id. at 5.

[9]     Dr. Zayco is a psychologist, who started treating Plaintiff on September 18, 2018 for "trauma-related symptoms after [the] accident." Zayco's Mem. at 1. Dr. Zayco diagnosed Plaintiff with chronic post-traumatic stress disorder ("PTSD"). Id.

[10]     For ease of reference, citations to the exhibits submitted at the hearing follow the pagination assigned by the Court's electronic filing system (CM/ECF).

### 1. Plaintiff's Testimony and Declaration[11]

At the time of the hearing, Plaintiff was fifty-seven years old. See Tr. at 15. Plaintiff has lived in Florida for five years and has "some college education." Tr. at 13. She went to the University of Connecticut for a year and then she began working. Tr. at 13. Plaintiff worked for the Norwalk Superior Court System for fifteen years. Tr. at 13-14. Plaintiff was a case manager and was then promoted to "court liaison for an alternative sanctions program." Tr. at 14. She had a number of jobs after that, including her job with CDR. Tr. at 14.

Plaintiff began working for CDR around December 2017. See Tr. at 15. At CDR, she was responsible for monitoring individuals who removed debris from the St. John's River after Hurricane Irma. Tr. at 16-17. Specifically, she "would get on [a] pontoon boat, ride with the captain to various sites . . . , and make sure that the appropriate debris was being removed and then follow [a] barge back to the extraction site where the extraction monitor would make sure that that was being removed properly as well." Tr. at 17. Currently, she is a voter registration organizer with the New Florida Majority Education Fund. Tr. at 14.

On January 15, 2018 at about 6:45 a.m. or 7:00 a.m., Plaintiff arrived at the Crystal Cove Marina to meet with Mr. Sams, who was going to drive the Pontoon Boat. Tr. at 17-

---

[11]     The undersigned credits Plaintiff's testimony in its entirety. In making credibility determinations, courts consider various factors including a witness's demeanor, the consistencies or inconsistencies within the witness's testimony, and any interest the witness may have in the outcome of the hearing; but the Court does not consider the official rank or status of the witness. United States v. Ramirez–Chilel, 289 F.3d 744, 749–50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"). Here, the Court has considered the relevant factors in making the credibility determination.

18, 22.[12] Plaintiff had "a lot of clothes on because it was freezing" that day. Tr. at 25; see also Tr. at 17. She was wearing three sweaters, a turtleneck, a scarf, a three-quarter-length down jacket, three pairs of socks, suede boots, three pairs of leggings, and a pair of pants. Tr. at 25. Plaintiff did not have a life jacket on. Tr. at 25.

When the collision happened, Plaintiff and Mr. Sams had been traveling for about an hour and were following a tugboat that was going to pick up a barge. Tr. at 21. Plaintiff testified she "just felt something inside say look to your right," and when she did, she saw Defendant's Vessel "very close" to the Pontoon Boat. Tr. at 23.

During Plaintiff's testimony about the accident, Plaintiff was visibly distressed, her voice constantly cracked while speaking, and she became tearful at times.[13] Plaintiff testified, "I just had a split second to decide what I was going to do, so I spun around on my seat . . . and I laid flat and I put my arms up as high as I could because in my mind I was thinking that I didn't want the propeller to chew me up from the motor." Tr. at 23. She "just laid down, and [she] prayed [she] wouldn't be killed." Tr. at 23. Plaintiff "got as much air as [she] could in [her] lungs before [she] was knocked in the water." Tr. at 23. Defendant's Vessel hit the back of Plaintiff's seat, and she "felt a tremendous pull." Tr. at 23. She "slowly slid[ ] into the water." Tr. at 23. Plaintiff testified, "I felt the cold water hit the top of my head, and I took my last breath because I thought it was going to be my last breath." Tr. at 23. Defendant's Vessel "grazed the bottom of [her] palms, and [she] could feel it." Tr. at 23.

---

[12]     Plaintiff did not know whether Mr. Sams had his captain's license, but she said he was very young and was the nephew of Crystal Cove's owner. Tr. at 18. Plaintiff had been out on a boat with him once before the accident, and she testified he did not seem to know what he was doing. Tr. at 19.

[13]     Plaintiff also became tearful and emotional when counsel showed her pictures of the Pontoon Boat in its post-collision state. See Ex. 1 (Doc. No. 92-2) (photographs of Pontoon Boat).

Plaintiff testified that it seemed she was under water for "an eternity." Tr. at 24. Plaintiff explained as follows:

> It seemed like forever, and when I finally came to rest, I looked around and I saw plants under water. It was dark. It was murky, and I remembered to try to just look for the light because that was my surface. I was disoriented because I went in backwards with my feet over my head, and so I couldn't really tell whether I was up, down, or whatever. But I looked for the sun for just light so I'd know what direction I needed to swim in, and that's what I did.

Tr. at 24-25.

Even though Plaintiff knew how to swim, she was having trouble getting back to the top. Tr. at 26. In the 1970s, Plaintiff had taken a lifeguard course and "went to a very exclusive camp where [she] learned to swim very well." Tr. at 26. While she was underwater after falling from the Pontoon Boat, her "lifeguard training kicked in," and that is why she knew to "look for the light." Tr. at 26. Plaintiff began to cry as she testified that she "held as much air as [she] could in [her] lungs and just would let a little bit out at a time so that [she] could . . . try [to] sustain [her]self, but towards the end [she] was . . . running out of air and [she] didn't think [she] would make it." Tr. at 26-27. She thought she was going to die. Tr. at 27.

Eventually, Plaintiff got back above water and began looking for the Pontoon Boat, but "it was very, very far away." Tr. at 27. Defendant's Vessel had "kept going," and Plaintiff could not see it at all. Tr. at 29. Plaintiff knew she could not swim to the Pontoon Boat, so she instead began treading water to look for the tugboat because she thought she might be able to climb up on it. Tr. at 28. She eventually saw the tugboat, which was about "half a football field away." Tr. at 28-29. Plaintiff became tearful as she testified that she began screaming for help, but nobody moved. Tr. at 28. Plaintiff testified, "If I was going to survive, I said I got to swim, so I started swimming." Tr. at 28.

According to Plaintiff, it was "extremely difficult to swim." Tr. at 30. Plaintiff testified, "I didn't want my life to end that way, and I wanted to just do everything I could to do it." Tr. at 30. Plaintiff was not thinking about freezing at that time, she just started swimming because "that was [her] only hope for survival." Tr. at 30. Plaintiff stated that it seemed like it took her "an eternity" to reach the tugboat, and she was "becoming exhausted halfway there." Tr. at 30. The captain of the tugboat was not driving towards her; he was "just still standing there looking." Tr. at 30. In tears, Plaintiff testified that her "lifeguard training kick[ed] in" and that she laid on her back and did the "dead man's float" until she could catch her breath again. Tr. at 30. Once she caught her breath, she began swimming but got exhausted again. Tr. at 31.

When Plaintiff was two feet away from the tugboat, she asked the tugboat captain to give her something to hold on to. Tr. at 31. He gave her a stick with a metal hook at the end of it. Tr. at 31. When she "grabbed it to pull [her]self in, he wasn't holding it, and it came in the water with [her]." Tr. at 31. The stick started floating away, and Plaintiff had to swim to grab it and bring it back to the captain to hold. Tr. at 31. The captain then held the stick tightly, and Plaintiff tried four times to put her leg up on the tugboat to get in. Tr. at 31-32. While she was trying to get up on the tugboat, the captain just "stood there." Tr. at 32. After the fourth try, the tugboat captain told her that the "threshold [was] too high" and that she would have to wait in the water until another boat came. Tr. at 32. He told Plaintiff to move to the front of the boat. Tr. at 32.

Plaintiff testified, "I remember taking the tips of my fingers and moving across the edge of the side of the [tug]boat to try to move to the front, and it's like my legs kept being sucked up there." Tr. at 33. She did not know what was under the tugboat, but she "tri[ed]

to fight to keep [her] legs from going under there . . . ." Tr. at 33. She eventually made it to the front of the tugboat and prayed again that she would not die. Tr. at 33. She was cold and shaking. Tr. at 33. Plaintiff was tearful as she testified that she knew there were alligators and moccasins in that area of the river ("along the edge in Palatka," Florida). Tr. at 33. Plaintiff had seen alligators there "just about every day." Tr. at 33.

Plaintiff then saw Defendant's Vessel speeding towards her, making waves that almost drowned her while she was holding onto the tugboat. Tr. at 33-34. Plaintiff motioned to Defendant to turn his engine off because he was going to drown her. Tr. at 33-34. Defendant stopped his Vessel, and Plaintiff swam over to it in about five minutes. Tr. at 34. Plaintiff testified it was "extremely difficult" to get in Defendant's Vessel. Tr. at 34. She was weak and had "zero strength left after all [she] had been through." Tr. at 34. She was also extremely heavy because of all the clothing layers she had on. Tr. at 34. After three attempts, Defendant was able to pull her up on the Vessel. Tr. at 34. At that point, Plaintiff could not move and "just laid there for the longest [time]." Tr. at 34. Plaintiff testified she had been in the water for a total of around thirty minutes. Tr. at 35.

Plaintiff wanted to go back to the shore, but Defendant told her they could not move because it was an accident scene. Tr. at 35. While they were on the Vessel, Defendant told her "that he would pay for everything." Tr. at 38. Plaintiff took off her clothes (except for her bra and pants); she testified that this was embarrassing for her but that she did not want to get hypothermia. Tr. at 36. Plaintiff stayed on the Vessel for about fifteen minutes before Defendant decided to go to the dock. Tr. at 36. It took about a half hour to get to the dock. Tr. at 36. When they were approaching the dock, Defendant's Vessel broke down, so Defendant had to "glide it into the boat slip . . . ." Tr. at 36-37.

Plaintiff began feeling pain when she got off the Vessel. Tr. at 37. Her back, neck, arm, and shoulder were "killing" her. Tr. at 37. At the marina, Defendant again told Plaintiff "that he would pay for everything." Tr. at 38. Plaintiff could not drive due to the pain, so she called Mr. Namho, who picked her up. Tr. at 39; <u>see</u> Tr. at 40.[14]

Plaintiff initially wanted to go to a hospital in Jacksonville, but due to the pain, she had to stop at the Orange Park Medical Center ("OPMC"). Tr. at 39-40. Plaintiff testified that at OPMC, "they" treated her "very poorly," "snatched" off a neck brace that she had on, and told her that nothing was wrong with her. Tr. at 40.

Plaintiff went home, but her shoulder was still "killing" her. Tr. at 41. When she "tried to do simple tasks, it was coming dislodged." Tr. at 41. Plaintiff was in "extreme pain" and was unable to lift her arm. Tr. at 41. Plaintiff could not sleep that night because the pain was "unbearable." Tr. at 42.

The next day, Plaintiff went to the Jacksonville Orthopaedic Institute where she saw Dr. Tandron. Tr. at 42. Dr. Tandron told Plaintiff that she had a "fractured rotator cuff with two tears" and that she may need surgery. Tr. at 43. Dr. Tandron, however, did not recommend surgery due to Plaintiff's age. Tr. at 45. Dr. Tandron explained to Plaintiff that people her age "do not heal well and sometimes it ends up being worse than the initial injury itself . . . ." Tr. at 45. Plaintiff did, however, receive physical therapy. Tr. at 43.

Plaintiff took off about ten or twelve days from work as a result of the accident. Tr. at 48. Plaintiff was not paid for that time. Tr. at 49. She went back to work because she "needed to pay [her] bills," but she was still in pain. Tr. at 48. CDR gave her "another job

---

[14]     Plaintiff did not take an ambulance because she did not have insurance and did not want to incur "the added expenses of taking the ambulance." Tr. at 37. Plaintiff also wanted to wait and "see if [she] was going to be okay," and she did not "feel comfortable in Palatka." Tr. at 37.

on land, which was an extraction monitor job." Tr. at 48. Plaintiff testified she "was blessed to roll kind of from one job to the next." Tr. at 49.

Since the date of the accident, Plaintiff's shoulder has "gotten a little better," but she still experiences pain, Tr. at 43, even when she is not using it, Tr. at 45. Plaintiff described the pain as a "knife in between [her] joints like someone is stabbing [her]." Tr. at 45. She is unable to lift her arms above her shoulders. See Tr. at 44. She cannot get things off a top shelf with her right hand. Tr. at 44. She has difficulty bathing, getting dressed, pushing, pulling, and trying to lift the garbage. Tr. at 61-62. She does not cook anymore, and she "used to love to cook." Tr. at 61. She cannot put her hand behind her back, so she has limitations with doing her hair. Tr. at 62. She has lost hair in the back of her head because it is difficult to comb it. Tr. at 62. Plaintiff testified that even turning the steering wheel of her vehicle hurts; "[i]t feels like [her shoulder is] being – like catching on something." Tr. at 45; see also Tr. at 61, 64. She has difficulty driving and cannot drive long distances. Tr. at 64. Plaintiff refrained from applying for a job that would have paid "up to six figures per year" because it required travel. Tr. at 64.

In addition, Plaintiff suffers from chronic PTSD from the accident. Tr. at 46, 53. When Plaintiff began seeing Dr. Zayco in September 2018, Pl.'s Declaration at 3 ¶ 5,[15] Plaintiff was unable to sleep and kept having flashbacks of the accident, Tr. at 47. Plaintiff sees Dr. Zayco once every two or three weeks, depending on Dr. Zayco's and Plaintiff's respective schedules. Tr. at 46-47. Between September 2018 and December 2018, Plaintiff saw Dr. Zayco about fourteen times. Tr. at 53. As of June 6, 2019, Plaintiff had

---

[15]     Plaintiff's Declaration contains unnumbered pages. Citations to it follow the pagination assigned by the Court's electronic filing system (CM/ECF).

seen Dr. Zayco about twenty-five times. <u>See</u> Pl.'s Declaration at 3 ¶ 5, 4 (indicating date of Plaintiff's Declaration). Dr. Zayco charges $150 per hour. Tr. at 52; Pl.'s Declaration at 3 ¶ 5. Dr. Zayco wants Plaintiff to continue seeing her, and Plaintiff so far has been able to see her on a consistent basis. Tr. at 55.

Plaintiff is making "some progress," but it is slow. Tr. at 55. She continues to have flashbacks of the accident. Tr. at 47. She cannot "watch television with water[ or] with accidents." Tr. at 47. She cannot "even watch TV at peace because [she is] constantly channel surfing" if there is water on a channel or a news story about someone drowning. Tr. at 63. Plaintiff used to love being on the water, and she lived near the water. Tr. at 47. Water used to be a "source of peace" for her, but now it is "a source of pain." Tr. at 47. Plaintiff also testified as follows:

> I notice like even when I go out I'm like watching people and like hypervigilant. You know, when I cross the – I don't like crossing the bridges and I'm thinking, okay, if the bridge breaks and I fall over, can I survive and I have to leave my door unlocked. Things that I never even worried about, never even thought about before I find myself angsting over.

Tr. at 53-54. Plaintiff still has nightmares and does not sleep well. Tr. at 61, 63. Plaintiff testified that looking at pictures of the accident scene at the evidentiary hearing, "brought [her] right back to that day." Tr. at 62-63. Plaintiff works, but she testified it is not easy because she is "on edge all the time." Tr. at 63. She was "never, ever like that" before the accident. Tr. at 63. Dr. Zayco told Plaintiff that she would have problems indefinitely with her PTSD. Tr. at 54.

At the time of the accident, Plaintiff was making $12.75 per hour. Tr. at 64. Currently, Plaintiff makes about $40,000.00 or $50,000.00 a year. Tr. at 55-56. Plaintiff confirmed that money is "tight." Tr. at 56.

Defendant paid Plaintiff a total of $3,436.00 within "a couple of months" after the accident, but Plaintiff's damages totaled more than that. Tr. at 50-51.[16] Specifically, Defendant paid $2,615.00 in lost wages and $821 in medical expenses. See Ex. 10 (Doc. No. 92-11). When Plaintiff asked Defendant to pay the remaining damages, Defendant assured her that he would, but he never did. Tr. at 50. Plaintiff called, emailed, and sent text messages to Defendant, but he avoided Plaintiff and never responded. Tr. at 50.

As of December 2018, Plaintiff's medical expenses as a result of the accident totaled $15,954.33. Tr. at 57-58. CDR reimbursed Plaintiff $15,133.33—the total medical expenses ($15,954.33) minus the expenses Defendant had paid for ($821.00). Tr. at 57-58; see Ex. 6 (Doc. No. 92-7).[17] In addition, although CDR did not pay Plaintiff for the days she missed work, CDR did pay her $17,380.00 in "maintenance [and cure] payments" as a result of her work injury. Tr. at 56-57; see Ex. 5 (Doc. No. 92-6).[18] The maintenance and cure payments were for food, electricity, and housing. Tr. at 56. As an employee of CDR, Plaintiff was entitled to maintenance and cure until she reached "maximum medical cure." Tr. at 57. After she settled her case against CDR, however, she was no longer entitled to

---

[16]    Defendant paid the amount in two installments: $2,000.00 on February 9, 2018 and $1,436.00 on February 16, 2018. See Ex. 10 (Doc. No. 92-11)

[17]    Exhibit 6, which contains a list of medical expenses, indicates Defendant paid $777. See Ex. 6 (Doc. No. 92-7) at 3. At the hearing, counsel for Plaintiff stated this was a mistake in calculation, and the correct figure is $821.00. See Tr. at 67.

[18]    "Maintenance and cure is designed to provide a seaman with food and lodging when he [or she] becomes sick or injured in the ship's service; and it extends during the period when he [or she] is incapacitated to do a seaman's work and continues until he [or she] reaches maximum medical recovery." Vaughan v. Atkinson, 369 U.S. 527, 531 (1962). Maintenance and cure is "due without regard to the negligence of the employer or the unseaworthiness of the ship." Gaspard v. Taylor Diving & Salvage Co., 649 F.2d 372, 374 n.3 (5th Cir. 1981).

receive such payments even though she had not reached maximum medical cure. Tr. at 57.

### 2. Dr. Tandron's Deposition

Plaintiff first saw Dr. Tandron on February 26, 2018. Dr. Tandron's Dep. at 6. Plaintiff presented with "loss of strength," and she "complained of popping, grinding, and pain with range of motion, [and] stiffness." Id. at 7. Dr. Tandron "examined her and evaluated her regarding her right shoulder." Id. He conducted a physical exam that consisted of testing Plaintiff's shoulder's range of motion and strength. Id. at 13. "At the end of the exam, [he] thought [Plaintiff] probably had an acute injury to her labrum[ and a] glenoid fracture." Id.

Dr. Tandron reviewed X-rays and an MRI that apparently were taken prior to Plaintiff's appointment with Dr. Tandron, perhaps when she was at OPMC. Id. at 7. Based on those X-rays, Dr. Tandron thought Plaintiff had "irregularity of the glenoid,"[19] and he "was worried for a glenoid fracture." Id. at 7-8. Dr. Tandron ordered additional X-rays and confirmed there was a glenoid fracture. Id. at 8.[20] Based on his review of the MRI, Dr. Tandron thought Plaintiff had "some labral pathology and tearing from the injury." Id.[21] The diagnostic studies showed in relevant part the following: 1) partial tearing of the supraspinatus, one of the main tendons of the rotator cuff; 2) irregularity of the superior labrum, likely a labral tear; 3) irregularity of the inferior labrum that was concerning for a

---

[19]    The glenoid is the "socket [of] the shoulder." Dr. Tandron's Dep. at 8.

[20]    Dr. Tandron confirmed he was aware that the X-rays taken on the date of the accident did not show a fracture. Dr. Tandron's Dep. at 31. According to Dr. Tandron, the X-rays taken on that date did not get the views that he got on the X-rays he ordered. Id.

[21]    The labrum is "the tissue that surrounds the socket [of the shoulder] all the way around from the front," and it "helps with the stability of the shoulder." Dr. Tandron's Dep. at 11.

labral tear; and 4) abnormal signal about the infra glenohumeral ligaments with possible tear of the inferior glenohumeral ligament. Id. at 10-13.

According to Dr. Tandron, the glenoid fracture and the labral tear were a result of the accident. Id. at 38. Dr. Tandron testified, however, that he would "have no way of knowing" whether the rotator cuff tear was caused by the accident. Id. at 35-36. According to Dr. Tandron, it takes "[s]everal months" for a glenoid fracture to heal, but a labral tear does not heal. Id. at 32, 34.

Plaintiff was advised to do "some gentle range of motion exercises," id. at 13, and receive physical therapy to improve her range of motion and strength, id. at 15. Dr. Tandron decided to treat Plaintiff's condition conservatively, "let the glenoid heal on its own, and then re-examine her." Id. at 13.

Dr. Tandron next saw Plaintiff on September 18, 2018. Id. at 14. On that date, Plaintiff presented with shoulder pain that was "somewhat worse." Id. at 16. Plaintiff "complained of sharp, burning-type pain that sometimes occurred at rest." Id. Plaintiff told Dr. Tandron that physical therapy "was helping [with] some of the strength." Id. Dr. Tandron took more X-rays of Plaintiff's shoulder, and he thought "the glenoid cavity fracture was healing nicely." Id. Dr. Tandron, however, testified the "progression . . . had been very minimal." Id. at 18. The treatment plan consisted of a "formal physical therapy program to start working on more strength and, again, range of motion." Id. Dr. Tandron also gave Plaintiff a topical anti-inflammatory to help with the pain, and he restricted her to no overhead lifting. Id. Plaintiff was taking Tylenol for the pain, but she "did not want to take a lot of medication." Id. at 27.

Plaintiff returned to see Dr. Tandron on October 23, 2018, as requested by Dr. Tandron. Id. at 18. Plaintiff "still complained of pain in the shoulder, obviously, some stabbing, burning, aching, said the pain was intermittent." Id. at 19. Dr. Tandron did think, however, that Plaintiff's range of motion had improved. Id. He ordered an arthrogram MRI of the shoulder. Id.

Dr. Tandron next saw Plaintiff on November 8, 2018. Id. He reviewed the arthrogram MRI, which showed "the little partial tearing of the rotator cuff and the inferior glenoid labral tear and some degenerative changes up top on the labrum." Id. Dr. Tandron opined that as of that date, Plaintiff had not reached maximum medical improvement. Id. at 21. Dr. Tandron told Plaintiff she could undergo surgery to repair the labrum, receive injections, or continue doing strengthening exercises. Id. at 20. He thought, however, that it was best to avoid surgery as long as Plaintiff was not experiencing any shoulder instability. Id.

Dr. Tandron testified there is "no reason to fix" the labrum because "in the older population group where [Plaintiff] is now[,] . . . sometimes if you fix the labrum then you get a very stiff shoulder." Id. at 40-41. Dr. Tandron further explained as follows:

> If they have pain, not instability, you could theoretically cut the biceps tendon, which inserts on the labrum, to take pressure off the labrum to help pain.
>
> That depends on the exam and what the goals of the patient are. If you have to cut the tendon, it could develop what's called a Popeye deformity where the biceps, instead of being normally formed, sits lower in the arm. If you end up doing a tenotomy, which is when you cut it, you lose about 10 percent of strength with flexion of the elbow, has been my experience, and about 10 percent of strength with forearm rotation, but alleviate shoulder pain.
>
> You could also do a tenodesis, where you grab the tendon, stick it in the bone, and not have the same deformity, but you could be left with pain at the insertion where you stick it in the bone.

Id. at 41.

Plaintiff decided to treat her shoulder conservatively instead of undergoing surgery.

Id. at 25. Dr. Tandron told Plaintiff to follow up as needed. Id. at 26-27. Plaintiff has not

contacted Dr. Tandron since the November 2018 visit. Id. at 27.

**3. Dr. Zayco's Memorandum**

Dr. Zayco began treating Plaintiff on September 13, 2018. Zayco Mem. at 1. As of

April 17, 2019, Plaintiff had been to twenty individual psychotherapy sessions with Dr.

Zayco. Id.

Dr. Zayco stated that Plaintiff has the following symptoms. Plaintiff "persistently re-

experience[s]" the accident in the following ways:

> (a) recurrent and distressing recollections of the event, including images,
> thoughts or perceptions; (b) recurrent distressing dreams of the event;
> (c) feeling as if the traumatic event were recurring, including flashback
> episodes; and (d) physiological reactivity on exposure to internal or external
> cues that symbolize or resemble an aspect of the traumatic event (breathing
> changes, hyperventilation, heart rate increase, tension).

Id. Plaintiff tries to "avoid thoughts, feelings, or conversations associated with the trauma,"

as well as "activities, places, or people that arouse recollections of the trauma." Id. at 2.

She has a "marked diminished interest or participation in significant activities" and

"feeling[s] of detachment or estrangement from others." Id. She also experiences the

following: "difficulty falling or staying asleep"; "irritability or outbursts of anger"; "difficulty

concentrating"; hypervigilance; and "exaggerated startle response." Id.

According to Dr. Zayco, the above symptoms "cause clinically significant distress

or impairment in social, occupational, or other important areas of functioning." Id. Dr. Zayco

opined that given Plaintiff's "psychological symptoms and vulnerabilities, the

recommended full course of psychological treatment would be two years twice per week individual therapy or three to four years of once weekly individual therapy." Id.[22]

### 4. Mr. Namho's Affidavit

Mr. Namho, who as noted lives in Illinois, is Plaintiff's friend. Namho Affidavit at 2 ¶ 7. Mr. Namho and Plaintiff used to be in a romantic relationship. See id. Mr. Namho stated, "[w]hile I do not blame the accident for our no longer being together, there is little doubt in my mind that it had a significant negative impact on our relationship as well as [Plaintiff's] relationships with others in general." Id. at 2-3 ¶ 7. Mr. Namho left Jacksonville in June 2018. Id. at 2 ¶ 7.

According to Mr. Namho, Plaintiff still has pain in her right arm and shoulder that "does not seem to be getting any better." Id. at 3 ¶ 7. Plaintiff has trouble sleeping on her right side, bathing, and "driving for any distance." Id. at 2 ¶ 5. She "tends to cook less" due to her shoulder issues. Id. "She used to enjoy going shopping but doesn't anymore." Id. Plaintiff now has a "phobia of water" and "avoids crossing bridges because they remind [her] of the river and water." Id. Mr. Namho wanted to go on a cruise with Plaintiff, but she could not go "because of her fear and flashbacks." Id. Plaintiff has nightmares about drowning. Id. According to Mr. Namho, Plaintiff "seems like a different person." Id. ¶ 6. Before the accident, she was "a very cheerful and trusting person." Id. As a result of how she was treated by Defendant and CDR, she "no longer has the same level of personal trust in people." Id.

---

[22]    Treatment with Dr. Zayco (starting from June 7, 2019—the date the Motion was filed) would cost as follows: 1) two years, twice a week would cost $31,200.00; 2) three years, once a week would cost $23,400.00; and 3) four years, once a week would cost $31,200.00.

## 5. Analysis

Plaintiff asserts her damages total $300,000.00. Motion at 2-3 ¶ 4. Plaintiff argues Defendant was ninety percent negligent and that CDR, Crystal Cove, and Mr. Sams were each 2.5 percent negligent. Id. at 3 ¶ 4. Accordingly, Plaintiff seeks $270,000.00 against Defendant. Id. at 3. The Motion does not seek to recover from Defendant any of Plaintiff's attorney's fees or costs.

At the hearing, Plaintiff's counsel explained that $300,000.00 "is about what a torn shoulder case would go for, and [Plaintiff] has much more serious emotional overlay than most people would have with a situation like this." Tr. at 72.

Plaintiff's counsel then provided a more detailed explanation of the damages sought. This detailed breakdown of the damages falls short of $300,000.00:

> [T]he maintenance [and cure] paid was the [$]17,380. I think we get that by assignment from CDR,[23] so I think that's where you start off with her claim.
>
> And then the medical is the $15,954. She's entitled to that just because it's her medical, not just because it's assigned to her. She gets it both ways. And then [Dr.] Zayco's bill. I just took the – [$]23,400 was the cheap end and [$]31,200 was the expensive end, and I just – the middle number there was [$]27,300. So I took those three numbers and added them up and came with $60,634.
>
> And then I looked at the mortality tables, and a lady of her age has about 26 years to live. . . . if you just did the math, that would be a little less than a dollar an hour for the rest of her life to have this problem.
>
> I think a dollar an hour is cheap to walk around with a bad shoulder and to have PTSD, so that's – that figure would come out to be $227,000. If you just took the [$]270 less – less the $60,634 of her pain and suffering, that would be $209,366 to get to [$]270, which we think we're – she's entitled to from [Defendant].

---

[23] The settlement agreement between Plaintiff and CDR assigned to Plaintiff "any and all claims, causes of action, and defenses available against [Defendant] with respect to the [a]ccident and/or [l]awsuit, including but not limited to, claims for common law indemnity and contribution." Ex. 9 (Doc. No. 92-10) at 4 (Settlement Agreement and General Release as to CDR Maguire).

Tr. at 72-73.

No evidence was presented to indicate that Plaintiff's request for damages is unreasonable or without basis.

As noted, Defendant paid $821.00 of the $15,954.33 in past medical expenses. See supra at p. 18; Ex. 10 (Doc. No. 92-11). In addition to past medical expenses, Plaintiff asserts damages in the amount of $27,300.00 for future medical expenses and $227,000.00 for pain and suffering ("a little less than a dollar" per hour for twenty-six years).[24] Tr. at 72-73. Tr. at 72-73. Plaintiff also claims that under the Settlement Agreement, Defendant assigned to her its crossclaim for contribution. See CDR Maguire's Amended Answer, Affirmative Defenses and Cross-Claims (Doc. No. 25), filed September 13, 2018. As such, Plaintiff argues she is entitled to $17,380.00 in maintenance and cure. See Tr. at 56-57, 72; Ex. 5 (Doc. No. 92-6).

Based on Plaintiff's testimony, Dr. Tandron's Deposition, Dr. Zayco's Memorandum, Mr. Namho's Affidavit, the Motion, and related papers, Plaintiff is entitled to $287,634.33 in total damages. Although Plaintiff asserts her damages total $300,000.00, the evidence she produced establishes the following specific damages, which add up to $287,634.33: $43,254.33 in medical expenses; $227,000.00 in pain and suffering;[25] and $17,380.00 in contribution for maintenance and cure.[26] These damages are warranted and reasonable.

---

[24]     Upon review, the undersigned finds that Plaintiff's suggested life expectancy of twenty-six years is reasonable. See Retirement & Survivors Benefits: Life Expectancy Calculator, Social Security, https://www.ssa.gov/cgi-bin/longevity.cgi, last visited Jan. 15, 2020.

[25]     In awarding Plaintiff damages for pain and suffering, the undersigned is particularly mindful of Dr. Zayco's statement to Plaintiff that she would have problems indefinitely with her PTSD, Tr. at 54, as well as Dr. Tandron's recommendation that Plaintiff avoid surgery, Dr. Tandron's Dep. at 20.

[26]     Contribution claims based on maintenance and cure expenses are allowed. See Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller, 92 F.3d 1102, 1107 (11th Cir. 1996).

Accordingly, Defendant is liable for $258,049.90[27] (ninety percent of the total damages, minus the $821.00 that Defendant paid in medical expenses).[28] See McDermott, Inc. v. AmClyde, 511 U.S. 202, 204 (1994) (holding that in admiralty cases, "the liability of . . . nonsettling defendants should be calculated with reference to the jury's allocation of proportionate responsibility" such that non-settling defendants pay their proportionate share of the total judgment and are not entitled to a setoff for the amount paid by any settling defendant); Murphy v. Fla. Keys Elec. Co-op. Ass'n, 329 F.3d 1311, 1314 (11th Cir. 2003).

Further, having been served with the Complaint, the Amended Complaint, and the Motion, Defendant has received adequate notice of the claims against him and the damages sought.[29] Despite having ample opportunity to respond and address these matters, Defendant has not filed anything in the case and did not appear at the evidentiary hearing. He has made no claim or request for an offset or reduced damages of any kind.

---

[27]     The Court rounded $258,049.897 up to $258,049.90.

[28]     The collateral source rule (applicable in admiralty cases) bars a tortfeasor from mitigating "damages by setting off compensation received by the [plaintiff] from an independent source." Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th Cir. 1972); see also Underwood v. NCL (Bahamas) Ltd., No. 17-24492-CV, 2019 WL 1559026, at *3 (S.D. Fla. Apr. 10, 2019) (unpublished) (finding collateral source rule applied in maritime personal injury action). Thus, the amount paid by CDR—an independent source—is not subtracted from Defendant's liability.

[29]     Plaintiff amended the Complaint only to substitute Crystal Cove for a previously named defendant. See Motion to Amend Complaint to Substitute Party (Doc. No. 15), filed August 13, 2018; Amended Complaint at 1 (title of pleading). The claims against Defendant remained the same. Compare Complaint, with Amended Complaint. Accordingly, Plaintiff did not have to serve the Amended Complaint under Rule 4. See Fed. R. Civ. P. 5(a)(2) (providing that "[n]o service is required on a party who is in default for failing to appear" but that "a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4").

Accordingly, as Plaintiff has established her claims against Defendant and her entitlement to damages, the undersigned finds it appropriate to enter a default judgment against Defendant for $258,049.90.

### V. Conclusion

Based on the foregoing, it is

**RECOMMENDED**:

1.    That Plaintiff, Monica Lynn Davis-Wilkes's Motion for Final Default Judgment Against Defendant Kenneth Bryan Helms (Doc. No. 86) be **GRANTED** to the extent that the Clerk of Court be directed to enter judgment in favor of Plaintiff and against Defendant Kenneth Bryan Helms in the amount of $258,049.90.

2.    That the Clerk of Court be further directed to close the file.

**RESPECTFULLY RECOMMENDED** in Jacksonville, Florida on January 15, 2020.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies to:

Honorable Marcia Morales Howard
United States District Judge

Counsel of Record

Pro Se Party
Kenneth Bryan Helms
636 Cedar Creek Road
Palatka, FL 32177